# CHARLESTON.

## DUNCAN v. DUNCAN.

Submitted January 31, 1911.    Decided October 31, 1911

DIVORCE—*Adultery—Desertion—Evidence.*

On a bill by a husband seeking a divorce *a mensa et thoro* on the ground of desertion, and an answer and cross-bill by defendant, admitting desertion, but charging adultery in justification thereof, and as a ground also for a divorce *a vinculo matrimonii* prayed for, the facts proven show desertion by the wife, but not adultery by the husband, entitling him to the relief prayed for, and precluding her from a divorce from the bonds of matrimony. (pp. 626 to 634).

Appeal from Circuit Court, Ohio County.

Bill by Chas. H. Duncan against Sarah Duncan. Bill and cross bill dismissed and plaintiff appeals.

*Reversed in part. Affirmed in part.*

*J. J. Coniff,* for appellant.

*Handlan & Reymann,* for appellee.

MILLER, JUDGE:

In a suit for divorce a *mensa et thoro,* brought by plaintiff, the husband, against defendant, the wife, on the ground of desertion; and on her answer and cross-bill seeking a divorce *a vinculo matrimonii,* for alleged adultery of plaintiff, the opinion and decree below was that plaintiff had not clearly proven his allegations, and should take nothing, and that his bill be dismissed; and that the allegations of defendant's answer and cross-bill had not been clearly proven, and that she should take nothing thereby, and that her said cross-bill be also dismissed.

Plaintiff has appealed, and defendant has assigned cross-error in this court. The record is voluminous, and includes the depositions of numerous witnesses. There is no conflict in the evidence as to the fact of desertion by defendant. Not only is it distinctly charged in the bill, and admitted in the answer, but it is fully proven by numerous witnesses, including the father and mother of defendant, with whom she and plaintiff resided from the date of their marriage in November, 1895, until August, 1906, when she deserted him, with the declared purpose never to again return as his wife. She first went to Clarksburg, where her brother resided, the plaintiff following her on the same train as far as Grafton, in an effort to induce her to return. This she declined to do. Plaintiff sent his mother-in-law to Clarksburg, there, to try and induce her daughter to return, and before she died, pending this suit, she testified on behalf of plaintiff, that with pleadings and tears she had endeavored, without avail, to get her daughter to go back home to her husband. Defendant did, however, that same evening, follow her mother back to Wheeling, going directly to the home of her aunt, Mrs. Taylor, and the following evening, in company with a Mrs. Brannen, left for Reno, Nevada. Learning of her

departure, plaintiff, at his own expense, sent his sister-in-law, the wife of defendant's brother, who resided at Clarksburg, out to Reno, to again try to induce his wife to return to him. This effort also resulted in failure. Later, in November following, plaintiff wrote defendant, at Reno, urging her to return, proposing any fair terms, and inquiring on what terms she would be willing to come back to him. To this letter she replied, December 6, 1906, in a very characteristic way, that she would return on the following conditions, namely, that he would furnish and maintain for her a home in town; that she should have the privilege of going and coming, when, where, and with whomsoever she pleased, with right to entertain whomsoever she desired, and that her actions were not to be criticised, or questioned either by him or by any one else; that her rulings regarding Dorothy, the little daughter, should be supreme; that the relationship of husband and wife should not exist, except in name only; that she should have her own room, and that there should be no trespassing therein, unless invited, and that she should be clothed and furnished with spending money consistent with her station in life; and after chiding him for alleged disrespect, she adds: "For Dorothy's sake, I am willing to make what I consider a sacrifice and return under conditions above named, provided you forward me five hundred dollars, ($500.00) with which to pay indebtedness and expenses to Wheeling."

Plaintiff did not accept this proposition. In January, 1907, however, defendant returned to Wheeling. Plaintiff first learned of her return by telephone message from his father-in-law, Mr. John Mendel, received at his place of business, saying that Mrs. Duncan had returned, and had gone to the school house, and taken Dorothy from school. On going out on the street he met Mrs. Duncan with the little girl, in company with a Miss Beall, coming down the street. He crossed the street and greeted her, took hold of the little girl's hand, and accompanied both to the house of Mrs. Taylor, the aunt, where he remained until evening. He says that after sending the child out of the room, he again tried to persuade Mrs. Duncan to return to his home, and again inquired of her as to the conditions on which she would be willing to go back and live with him. Her answer was, that he had her only terms in the letter she had written him from Reno. He told her that he could not accept those

terms.    After leaving her he procured his mother-in-law to go and see defendant, and to try to induce her to return, but she did not succeed.    Mrs. Duncan remained obdurate.    Later he sent his father-in-law, and the chief of police after the little girl, who got and took her to his home.    Afterwards he brought this suit.

We think these and other facts proven, clearly establish desertion.    If not, it would be difficult to make out a case of that kind.

But the rights of the parties then must be determined on the truth or falsity of defendant's charges of adultery, as showing good cause for desertion; and as grounds for the affirmative relief 'she seeks against plaintiff.    She charges: First, that some time prior to August 26, 1906, and particularly about three months prior thereto, she received information of the misconduct and misdoings of plaintiff, but of which she had never heard the full particulars and details, until on August 24, 1906, when in her presence, he was accused thereof by Ida Brannen; that some three or four years prior to that time she had received information from her mother that plaintiff was then suffering with a venereal disease, which he could not have contracted, except by adulterous conduct, her mother, as she alleges, then giving her, what seemed to be conclusive proof thereof, but of which she was not then satisfied; that some three months prior to August 26, 1906, she had learned that said charges were true, and that he was then not only suffering from that disease himself, but had communicated it to her, and from which she had suffered for a long time without knowing the cause, and had required the treatment of a physician;    second, on information received prior and subsequent to said date, she charges that plaintiff, after his marriage, had been guilty of adultery with Florence Dilworth, and other women unknown to defendant, and that during the same period he had frequented houses of prostitution, and had conducted himself in grossly immoral and indecent manner on many occasions.

These are all the specific charges made by defendant in her answer; but without amendment of her pleadings she undertook to prove by Stella Fendt, a common prostitute, that in 1903, plaintiff had on several occasions been guilty of adultery with her while she was employed in plaintiff's laundry;    and by Sue

Ingham, another prostitute, and proprietress of a house of ill fame, she proved that since the institution of this suit plaintiff, on two different occasions, had been guilty of adultery with her. Her evidence was objected to, because relating to alleged transactions occurring subsequent to the suit. However, she fixes the time after she had been confined in a hospital with typhoid fever, and had returned home. She was almost positive that the first time was in April, 1908; later she swears it was in April. The next time she fixes about a month later, in May. The Fendt girl, who had been employed in another laundry before she was employed by plaintiff, says, that the first instance with her was at night, in plaintiff's laundry; the next time at an assignation house in Wheeling, to which plaintiff took her.

An effort was also made to convict plaintiff of improper relations with other female employees. This was a signal failure, for want of proof. The Fendt girl swore that plaintiff had had such relations with nearly all of his female help. The only one specifically mentioned was a young woman whose father had died, and whom plaintiff was seen taking to an undertaking establishment one day in his buggy. No proof was offered connecting him with any improper conduct with Miss Dilworth, as charged in defendant's answer.

Defendant is flatly contradicted by her mother, as to the alleged information obtained from her. She denies that she ever gave her any such information, or that it in fact existed. Both father and mother attest the good character and habits of plaintiff, and his kindness and devotion to his family, and to them. The Fendt woman is flatly contradicted not only by plaintiff himself, but by many corroborating facts and circumstances; also by the evidence of another female employee who swears that she worked with Miss Fendt, and that when the latter worked at night she worked with her, and went away with her; and the foreman and the time-book kept by him, showing extra time made by these two women, corroborate these witnesses. A young lady bookkeeper employed by plaintiff gives strong, direct and corroborating evidence contradictory of the story of the Fendt girl. An affidavit made by Miss Fendt at the instance of defendant's counsel, before her evidence was taken, is in conflict with her testimony on the witness stand, in some

important particulars. Plaintiff swears that after his foreman had discharged Miss Fendt, she appealed to him to get her reinstated, and that when he declined, she told him, with an oath, that she would get even with him. She does not deny this. This fact is relied on to show motive on the part of this woman to swear falsely.

Respecting the Ingham woman, her testimony stands wholly unsupported. Plaintiff had some trouble with her about a laundry bill. He flatly contradicts her, and she is also contradicted by the driver of plaintiff's laundry wagon, who swears that he accompanied plaintiff on each visit to her house, to see her about the bill, and that at no time was plaintiff out of his plain sight while in the witness' house. Both swear that plaintiff requested the driver to follow him into the house, and not to allow him to get out of his sight, that because of the trouble he was then having with his wife, he feared he might be, as he has been, charged with improper conduct with this woman. Another fact stipulated by counsel, tending strongly to contradict this woman, and shown by the hospital records is, that she went into the hospital March 23, 1908, and did not leave until May 2nd, so that plaintiff could not have had his first intercourse with her, as she swears, in April of that year.

The strongest evidence in support of the defendant's cross-bill, is that of Dr. Plant. His testimony was objected to, on the ground of his professional relationship to plaintiff. He seems to have given his testimony willingly, regardless of the objection. Plaintiff swears he discharged him from service, and afterwards had some trouble with him in connection with one Johnson, at his laundry. Dr. Plant's testimony in substance is, that in the fall of 1903, correcting himself he said, in the summer of 1903, he was called to see the plaintiff, and found him suffering from a catarrhal condition of the sexual organ, which he pronounced gonorrhoea, and that upon a microscopic test, he found the germ gonococcus in this discharge; that he also found evidences that the plaintiff had been previously treated for the same disease. He also swears that two or three weeks after this he was called to see Mrs. Duncan, professionally, and that he also found her suffering with an inflammatory condition of the uterus, ovaries and fallopian tubes, and the presence of

gonococcus in her vaginal discharges; that he informed plaintiff of these facts, and that upon his advice arrangements were made to take her to the hospital, for an operation. Plaintiff, while admitting that Dr. Plant was called by him, and afterwards by his wife in this professional way, yet he swears that he stoutly protested at the time against the diagnosis of Doctor Plant. He says that he had never in any way subjected himself to the dangers of such disease, and that he had not communicated it to his wife. He admits that, urged by Dr. Plant to do so, he had gone with him to the hospital and looked at a room, which would be satisfactory in case an operation was found necessary, but that on that occasion he had distinctly told the doctor he would not permit his wife to go to the hospital for such operation, without the consultation and advise of one or more other physicians, that an operation was in fact necessary. He then or soon afterwards demanded of Dr. Plant his bill for services rendered, and called Dr. Frank L. Hupp, a reputable physician, who made an examination of plaintiff's wife, and who pronounced the discharge not gonorrhœa, but leucorrhœa, with which he testified most women suffer, more or less, after child birth, and with which plaintiff testifies his wife had suffered ever since the birth of her child, Dorothy. On the advice of Dr. Hupp Mrs. Duncan got out of bed, went about her duties, took treatment from him, and while Dr. Plant gives it as his opinion that she is still afflicted with gonorrhœa, Mrs. Duncan herself does not pretend to be seriously afflicted in any way. She continued thereafter to reside with her husband, until she broke off her marital relations, as alleged, in August or September, 1906. And it must not be forgotten, that the defendant charges in her cross-bill, that her mother, some three years previous, had given her information which amounted to conclusive proof, that plaintiff was then suffering with a venereal disease. After getting this information she continued to live and cohabit with him as his wife, without complaint, so far as the record shows.

Respecting the opinion of Dr. Plant, as to the nature of his malady, plaintiff further swears, that a day or two after Dr. Plant had expressed his opinion, he called Dr. N. D. Jobes, who, after an examination, gave it as his opinion that the plain-

tiff did not have gonorrhoea, but that his trouble was the temporary result of injuries received shortly prior to that time, from the falling of a box upon his back, evidenced by severe bruises, which he found there, and which yielded readily to external treatment, prescribed by Dr. Jobes; that within a week's time the trouble was gone, and that he has not from that day forward suffered from that or any like malady. Dr. Jobes, as a witness for the plaintiff, fully corroborates him. He did not make a microscopic examination, as Dr. Plant professes to have done, but states it as his opinion, after an examination of the discharge, and from the manner in which it yielded to treatment, that the plaintiff was not afflicted as Dr. Plant had advised.

There is much evidence of other witnesses, pertaining to the conduct of plaintiff and defendant, and reflecting their relationship to each other, and more or less pertinent, but which it is impossible to detail in a judicial opinion, and we are satisfied, as was the court below, that the defendant's charges against her husband are not sustained, and that her cross-bill was properly dismissed.

Another circumstance, not heretofore mentioned, has impressed us, that is, that the immediate cause of defendant's breaking off matrimonial relations, with plaintiff, and deserting him, does not seem to have been his alleged infidelity, of which she says she had obtained information by her mother months before, amounting to conclusive proof. The immediate occasion of her going away was the objection her husband, and her father and mother all interposed, the night before she left, to her going off with young unmarried men, in company with Mrs. Brannen, to a fishing club, in an out of the way place, and returning with them late at night. After Mrs. Brannen had left, to use the defendant's own language, "Mr. Duncan and I went upstairs, and he was still scolding quite a good deal, and I told him that things now were all over between us; that I never intended to live with him again as his wife, and would leave the next morning." In this conversation, she does say that Mrs. Brannen, accused the plaintiff of being untrue to her, to which he replied that she was "talking about things she didn't know anything about," but that as he did not more specifically deny

Mrs. Brannen's accusations, she interpreted what he did say to be an admission of its truth.    This Mrs. Brannen, who is a cousin of defendant, and the woman with whom she traveled to Reno a few days afterwards, was not examined as a witness on either side.    The evidence convinces us that this woman was the disturbing element in this family.    It was from her home, in Reno, that defendant made her declaration of independence, in her letter to her husband of December 6, 1906.

We are very reluctant to disturb the decree of the court below in a divorce proceeding, and particularly so, coming as this one does from the hands of so able and painstaking judges, as those of the circuit court of Ohio county; but we have a duty to perform as well as they.    The plaintiff sought relief on the ground of desertion.    Desertion is admitted and fully proven.    It was incumbent upon the defendant, if she would defeat the plaintiff, or sustain her grounds of cross relief, to prove her charges of infidelity.    This the decree below says she did not successfully do.    On the evidence, we are of the same opinion.    If then the plaintiff has proved his case, and the defendant has failed in the proof of her allegations against him, we do not see how we can withhold from him the relief prayed for.    We must look at this case as we do at all other civil causes. We must determine the rights of the parties in the same way, based on the pleadings and proofs, giving them their full legal force and effect.    We do not see how we can justly deny plaintiff relief.

No legal propositions have been argued or presented for decision.    The case involves no new legal principles.    Our conclusion is to reverse the decree below, in so far as it denies plaintiff relief and dismisses his bill; and to enter such decree here as we think the circuit court should have entered, adjudging the plaintiff entitled to the relief prayed for, and that plaintiff and defendant be divorced *a mensa et thoro,* as prayed for in his bill.

*Reversed in part.    Affirmed in part.*